J-S36032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: N.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.J.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 786 WDA 2025 |

Appeal from the Order Entered May 22, 2025
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s): 2025-00004 A

BEFORE: PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED: December 9, 2025**

A.J.S. (Father) appeals from the order involuntarily terminating his parental rights to his biological child,[1] N.A.S. (born 1/2023) (Child), pursuant to Sections 2511(a)(2), (5), and (8), and Section 2511(b) of the Adoption Act.[2] **See** 23 Pa.C.S. §§ 2101-2938. After careful review, we affirm.

The orphans' court set forth the facts of this case as follows:

[Jefferson County Children & Youth Services (CYS)] became acquainted with the subject family on January 24, 2023, when a caseworker made an unannounced home visit[, days after Child

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court appointed Lauren Brennen, Esquire, to represent Child's legal interests and appointed Greg Sobol, Esquire, as guardian *ad litem* (GAL), to represent Child's best interests. **See** Orphans' Court Opinion, 5/22/25, at 1 n.1; **see also** 23 Pa.C.S. § 2313(a).

[2] The orphans' court also terminated Children's biological mother's (Mother) parental rights. We consider her appeal at 787 WDA 2025.

was born,] in response to a referral. The caller reported concerns about Father's aggressiveness, Mother's ability to parent their child given her intellectual deficits and seizure disorder, and concerns that the couple lacked adequate material resources to properly provide for their newborn.[3]

At the time of that first encounter, the family was facing eviction but was waiting to receive word that they were able to move into the apartment they had been approved to occupy at Sycamore Apartments in Punxsutawney. [CYS] paid for them to stay two nights at a motel during the transition and implemented remedial services[4] designed to forestall taking custody of [Child]. [CYS] closed the case approximately two months later.

A CYS caseworker [returned to] the apartment within days [of closing the original case] to investigate a report that Mother did not feel safe with Father, who would not permit her to leave the residence.[5] The caseworker confirmed as much when she arrived, as Father would not allow her to enter or Mother to exit. Only when the police arrived did he relent, removing the chain lock and allowing Mother to leave with [Child]. [Mother and Child] went to stay with a relative, and Mother was expressly advised that [CYS] would seek emergency custody of [Child] if she

_____

[3] The allegations included that, while at the hospital during childbirth, Mother "needed an emergency [cesarian] section[,] and [Father was] upset because that wasn't the birth plan[; Father] had to be removed from the hospital at that time." N.T. Involuntary Termination Hearing, 5/9/25, at 6. Father was permitted to return into the hospital building after Child's birth. *See id.*

[4] The remedial services provided to Mother and Father included "working on setting up social security [payments] for [Mother], getting a blended case manager for [Mother pursuant to the Medicaid State Plan], setting up [transportation services], finding employment, and [parenting resources.]" N.T. Involuntary Termination Hearing, 5/9/25, at 8.

[5] *See* N.T. Involuntary Termination Hearing, 5/9/25, at 9 (CYS Caseworker Emily Mescall testifying that Mother reached out to family because she did not feel safe in apartment with Father on two consecutive days, and on second day, Father essentially barricaded himself, Mother, and Child in apartment behind chain-locked door, and when Father finally permitted Mother and Child to leave, Mother sought refuge with Child away from Father, with her family).

returned to Father. That warning did not stop Mother from returning to the apartment [to stay with Father] a few days later.

At the outset, [Child] was placed with Ted and Pam Rake, Mother's great aunt and uncle. The arrangement was meant to be temporary while Mother and Father completed the clearly defined objectives that would lead to reunification, including stabilization of their mental health, completion of a designated parenting program, anger management counseling, and acquisition of the physical resources that would allow them to properly care for [Child], e.g., a consistent income, adequate transportation, and stable housing.

When the court changed the goal to adoption on October 30, 2024, Mother had fulfilled most of the technical requirements of the family service plan ([]FSP[]), and Father had completed many of them. [Father] all but ignored the most essential goal, however—mental health stabilization, waiting until just a couple of weeks prior to the goal change hearing to purportedly begin a consistent and sustained course of behavioral health treatment.

Their on-paper compliance notwithstanding, Mother and Father were unable to successfully implement the skills their service providers were trying to teach them. As much as she loved [Child], Mother lacked the mental capacity to retain and effectively utilize the information she was given. Father was not impeded by similar intellectual deficits. What he lacked, however, was the willingness to acknowledge that his and Mother's conduct, not CYS, the Rakes, or the court, was the reason for [Child]'s continued dependency.

Convinced that he was blameless, Father went through the motions of completing some of CYS's demands, including anger management and more than one parenting curriculum, but failed to internalize the most important lessons—the ones that would have made him look at himself and realize that his own angry outbursts, defiant behavior, and everyone-else-is-the-problem mentality were defeating his purported objective of bringing [Child] home permanently.

Even while reunification was [CYS]'s designated outcome, [] Father saw no problem with persistently complaining during supervised visits about CYS, the Rakes, and the unfairness of the situation instead of focusing his attention on [Child,] with making Child[L]ine reports against the Rakes and CYS and threatening to make more[,] with yelling at the other attendees and storming out

of a family group decision meeting[,] with repeatedly being verbally aggressive with the Rakes and [Caseworker Mescall; or with angrily dismissing [C]aseworker [Mescall] from his and Mother's apartment on April 24, 2024. Those were not isolated events that were out of character for Father, either. Rather, his temper, as displayed at the hospital while Mother was giving birth, was among the things that first brought the family to CYS's attention. [Caseworker] Mescall deemed the above-referenced instances to be especially notable, however, and credibly testified that Father and Mother became increasingly hostile and verbally aggressive toward her and the Rakes as [Child]'s dependency case progressed.

[From the October 30, 2024 goal change to the May 9, 2025 termination hearing, CYS] had almost no contact with Mother or Father.[6] At the termination hearing, therefore, [Caseworker] Mescall [testified that she] could not confirm that Father had been working for the same employer for more than a year, that Mother had secured a part-time job[,] or that the couple had acquired reliable transportation. Nor could she confirm whether Father had been treating with a therapist at Penn Highlands [Health System] on a bi-weekly basis[.] She clearly remembered her extended history of interactions with both parents, however, and did not believe that any of th[eir] achievements would have rendered them fit to be parents. Having seen and heard them in the courtroom on May 9, 2025, the [orphans'] court would agree.

"It's not my fault"[;] "I did everything right"[; and] "Everybody misunderstands me." [***See, e.g.***, N.T. Involuntary Termination Hearing, 5/9/25, at 89, 92, 94, 126.] If the court had only three sentences in which to encapsulate Father's testimony, these are the ones it would choose because after attending several dependency hearings and listening to [Caseworker] Mescall's testimony at the termination hearing, Father maintained that CYS had no legitimate reason to remove [Child] from the home or

---

6 ***See*** Orphans' Court Opinion, 5/22/25, at 7 n.6 (observing that "After the goal change, [CYS] discontinued all efforts toward reunification, ignored most of Mother and Father's attempts to communicate, and advised the foster parents that they had no obligation to respond should Mother or Father [attempt] contact[. . . . ]Mother and Father had no further opportunity to exercise their parenting skills and foster a relationship with [Child] after October 30, 2024.).

retain [Child's] custody. False allegations, individual and corporate corruption, and personal animosity, he insisted, were the driving forces behind it all. He saw himself merely as a victim in the entire scenario. After averring multiple times that he had done everything [CYS] had asked him to do, Father [] acknowledge[d] at one point during his lengthy testimony that he could have done "better" throughout the process, but only in the vague sense that he could do a lot of things better.[7] Not once did he take responsibility for the circumstances that ultimately led to the filing of the petition to terminate his parental rights, though.[8] The closest he came was to concede that his therapist

_____

[7] On "doing things better," Father testified that: (1) he would not have "answered the phone to CYS," N.T. Involuntary Termination Hearing, 5/9/25, at 98; (2) "Did I say that I take no responsibility? Because I think I have said multiple times that I've made mistakes all throughout this. I've made mistakes all throughout my life. I'm a fallible human[.] I make mistakes everyday of my life," *id.* at 115; (3) "There's multiple situations I could have handled better. Even with the one where I kicked [Caseworker Mescall] out of my house. I believe I could have handled that better. Anytime I have any interaction with anybody, I believe I can do it better. I mean, I have a very hard time getting the words I want out, out," *id.* at 122-23; and (4) "I can say that a lot of what I've done is inappropriate[. . . . M]y behavior to me has been justified but like you said when it's viewed by somebody else, [. . .] it could be taken a completely different [way]. [W]e all have our own interpretation of what certain things mean. [. . .] I do understand how I could have been inappropriate and that I could have handled things more appropriately than what I did. I mean, can we go back in time and change it? No." *Id.* at 126.

[8] During Father's testimony, he cast blame on the following: (1) Caseworker Mescall and CYS, *see* N.T. Involuntary Termination Hearing, 5/9/25, at 89; (2) the Rakes, *see id.* at 97, 107; (3) those who reported allegations to CYS, *see id.* at 113; (4) hospital staff, *see id.* at 64; (5) Mother, *see id.* at 81, 124; and (6) his sister, *id.* at 120-21. Also, during his testimony, Father posited that Attorney Sobol's questions were "aggressive," *id.* at 99, that he had not done anything aggressive during the life of the case, *see id.* at 125, and that, during the "stalking" incident, the Rakes were aggressive when they "all [of] a sudden[,] without even putting their indicator on, ma[d]e a left turn" with "squealing brakes," *id.* at 95, 106. Further, Father stated that Pam Rake had aggressively slammed a door and incited arguments via notes she
*(Footnote Continued Next Page)*

at Penn Highlands had helped him understand how other people may have misperceived as angry and aggressive the manner in which his generalized anxiety caused him to respond to stressful situations.

Merely eschewing responsibility did not suffice, either; Father also sought to actively shift the blame. [Caseworker] Mescall and [CYS] were his primary targets, and his charge was that they had decided they were going to change the goal after he exercised "[his] right as an American citizen," [*see* N.T. Involuntary Termination Hearing, 5/9/25, at 92,] to kick [Caseworker] Mescall out of the apartment on April 24, 2024. Intending to impede his and Mother's ability to meet the FSP requirements and be reunified with [Child], he proffered, [CYS] began to miscommunicate both the goals and the state of his and Mother's progress. [Caseworker] Mescall and CYS were not his only targets, though; he also accused [the] Rake[s] of stalking him and Mother, facing hostile, and obstructing communication between the couples. Others he deemed to be blameworthy included Mother's aunt, who purportedly lied when she reported that he was refusing to let Mother leave the apartment in March of 2023, and unidentified medical staff, who allegedly falsified the medical records pertaining to [Child]'s birth.[9]

Mother was equally clueless. Having gone through the same parenting curricula as her fiancé and months of verified counsel[]ing, she, too, saw no cause for [Child]'s removal and continued dependency. Perhaps more concerning, she fully aligned herself with Father. Seated in the second row behind her attorney, she visibly demonstrated her full support of Father's testimony, including his paranoid-sounding ideas and refusal to answer counsels' "red herring" questions.[10] When she took the witness stand, moreover, Mother adamantly denied prior domestic

_____

left in a communication journal established to facilitate communication between the Rakes and Mother and Father.

[9] Father testified that the medical records incorrectly stated that Mother's and Child's heart rates were decreasing during the procedure, rather than increasing. *See* N.T. Involuntary Termination Hearing, 5/9/25, at 64; *see id.* at 111.

[10] *See* N.T. Involuntary Termination Hearing, 5/9/25, at 90, 92, 113, 116.

violence, said that Father only began displaying signs of anger after [Child] was adjudicated dependent[,] affirmed that she had no concerns with [Father] being too aggressive[,] and testified that the March 2023 incident was a misunderstanding. As the saying goes, however, actions speak louder than words.

Though a sweet and likeable person. Mother is a low-functioning adult, and perhaps Father takes advantage of her disability to deliberately manipulate her. Perhaps she merely fails to understand and properly interpret human behavior. Or perhaps she forgets the bad times when things are good. Whatever the case may be, the picture Mother painted at the termination hearing did not match the one that emerged from unfiltered events spanning the history of this and the underlying dependency case. When she disclosed at Menta Psychological[, which provides counseling and mental health services,] that she had been the victim of domestic violence, for instance, Mother was in a safe and private setting, speaking to a neutral audience of one. In March of 2023, moreover, it was not until the police arrived that Mother was able to exit the apartment, and when she did, rather than stay to clear up the "misunderstanding" her aunt perpetuated, she fled with [Child] to her grandmother's house. Those were the actions of a woman afraid, not one whose paramour had been gently and lovingly trying to calm her down while she was behaving unreasonably. In each instance, her contemporaneous words and actions, uninfluenced by time or persuasion, reflected her actual thoughts and feelings about the subject matter.

Their deficiencies notwithstanding, Mother and Father love [Child], and when they were with her, their direct interactions were positive and nurturing. As a result, the child bonded with both of them and, at least as of six-and-a-half months ago, showed them affection and enjoyed spending time with them. Those were not the only parent-child bonds [Child] formed, though.

Since becoming acquainted with them several months ago, [Child] has also developed bonds with [Child's] pre-adoptive family. They, too, are recipients of [Child's] affection, and [Child] is, according to [Caseworker] Mescall, "doing phenomenal" in their care. [The pre-adoptive foster parents, who were relatives of the Rakes,] began communicating and interacting with [Child] long before they were approved as a kinship placement through the [Interstate Compact on the Placement of Children] process, and their efforts in that regard facilitated a smooth transition when

[Child] went from one home to the other. [With the pre-adoptive foster parents in West Virginia, Child] is comfortable and having all [] needs met, and the symptoms of distress [Child] began exhibiting following visits with Mother and Father have ceased since contact between them was discontinued on October 30, 2024.

Unfamiliar with the West Virginia [pre-adoptive family], Mother and Father have proposed an alternate kinship placement[:] Father's mother and stepfather—the same stepfather he said had abused him growing up, and the same mother with whom he severed ties at the age of eighteen because she failed to protect him.[11] Asked to explain why he thought that was a good idea, Father did not deny his earlier reports but said he was angry at the time[,] had since reevaluated those relationships[,] now recognized his own culpability in creating the tension between them[,] and decided that his stepfather had not actually been abusive.[12] Mother was more honest. She had not changed her mind about Father's stepfather and testified that neither [she nor Father] wanted [Child] to be around [Father's stepfather].[13] She assured the court that they were fine with Father's mother being [Child]'s caretaker, though. Presumably not reali[z]ing the necessary implications, [Mother] acknowledged that Father's mother and stepfather were still married [and live with each other].

Orphans' Court Opinion, 5/22/25, at 1-6 (unnecessary capitalization and footnotes omitted).

CYS filed the at-issue termination petition on April 3, 2025. After the May 9, 2025 termination hearing, the court issued an order and written decision on May 22, 2025, terminating both Father's and Mother's parental

---

[11] **See** N.T. Involuntary Termination Hearing, 5/9/25, at 120.

[12] **See** N.T. Involuntary Termination Hearing, 5/9/25, at 121.

[13] **See** N.T. Involuntary Termination Hearing, 5/9/25, at 154.

rights to Child.[14]  Father appealed on June 20, 2025, and he and the court complied with Pennsylvania Rule of Appellate Procedure 1925.  **See** Pa.R.A.P. 1925(a)(2)(i).

On appeal, Father raises the following issues for our review:

1. Did the [orphans'] court err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) without the support of competent evidence?

---

[14] Before reaching the merits of Father's appeal, we must ensure it is timely filed.  **See M.L.S. v. T.H.-S.**, 195 A.3d 265, 267 (Pa. Super. 2018) ("It is axiomatic that this Court lacks jurisdiction over untimely appeals."); **see also B.A.B. v. J.J.B.**, 166 A.3d 395, 400 n.9 (Pa. Super. 2017) (appellate court may *sua sponte* question appealability of order as it implicates jurisdiction).

Instantly, we observe that the appeal period has technically not begun to run as the Clerk of Jefferson County Courts failed to include any notation in the docket pursuant to Pennsylvania Orphan's Court Rule 4.6(b).  **See** Pa.O.C.R. 4.6(b); **see also** Pa.R.A.P. 301(a) ("no order of a court shall be appealable until it has been entered upon the appropriate docket in the lower court"); **see also** Pa.R.A.P. 108(b) (date of entry of order "shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)"); **see also** Pa.O.C.R. 4.6(b), note ("Rule 4.6 [. . .] is derived from Pa.R.C[iv].P. [] 236.").

Nevertheless, despite the clerk's failure to notate Rule 4.6(b) service in the docket, Father obviously received the May 22, 2025 order, as he filed his notice of appeal within 30 days of its entry.  **See** Pa.R.A.P. 903(a) (to be timely, notice of appeal must be filed within 30 days after entry of appealable order"); **see also** Notice of Appeal, 6/20/25.  Accordingly, we may treat Father's appeal as timely filed because we may consider "done that which ought to have been done." **Commonwealth v. Carter**, 122 A.3d 388, 391 (Pa. Super. 2015) (citation and quotation marks omitted).  Further, as this case is designated as a children's fast track case, we see no need to delay our review under these circumstances and conclude, therefore, that the appeal has been perfected. **See Frazier v. City of Phila.**, 735 A.2d 113, 115 (Pa. 1999).  Thus, we may consider the merits of this appeal.

2. Did the [orphans'] court err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(5) without the support of competent evidence?

3. Did the [orphans'] court err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) without the support of competent evidence?

4. Did the [orphans'] court err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa. C.S. § 2511(b) without the support of competent evidence?

Appellant's Brief, at 7-8.

Our Supreme Court has set forth the well-settled standard of review of a court's grant of a termination of parental rights petition, as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, quotation marks, and brackets omitted). Further, "CYF must prove the grounds for termination of parental rights under 23 Pa.C.S. § 2511 by clear and convincing evidence." *Id.* (citation omitted). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024).

- 10 -

Also, "the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses[,] and all conflicts in testimony are to be resolved by the finder of fact." *Id.* (citation and brackets omitted). Finally, we need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

> In evaluating whether the petitioner proved grounds under [Section] 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing best interest approach. If the trial court determines the petitioner established grounds for termination under [Section] 2511(a) by clear and convincing evidence, the court then must assess the petition under [Section] 2511(b), which focuses on the child's needs and welfare.

*Id.* (citations and quotation marks omitted).

Here, we limit our review to the orphans' court's analysis under Subsection 2511(a)(8). *See* 23 Pa.C.S. § 2511(a)(8); *see also M.E.*, 283 A.3d at 830. Subsection 2511(a)(8) states that parental rights to a child may be terminated if "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. § 2511(a)(8).

On this issue, although Father concedes the first prong is established, *see* Appellant's Brief, at 24, under the second prong, he disputes that the conditions which led to Child's removal continue to exist because all CYS's

concerns were addressed. Father complains that CYS failed to identify how he should address CYS's concerns regarding his mental health and notes that he attended counseling for "many sessions prior to his discharge at Community Guidance [Center]."[15] Appellant's Brief, at 25. Moreover, Father argues that, in all cited incidents of his alleged frustration or mental health concerns, there was no evidence of "any physical violence[,] and the minor child was not present." *Id.* Father contends that, "[s]ince engaging with a new therapist, Father has learned better ways to handle his stress[, and CYS] did [not] present sufficient evidence to show that the conditions which led to [C]hild's removal still existed." *Id.* at 25-26. Father also disputes that terminating his parental rights is in Child's best interest and points both to the GAL's closing argument, which admitted that Mother and Father love Child, as well as Child's counsel's argument that opposed termination of Father's rights and mentioned the bond between the biological parents and Child. *See id.* at 26.

This Court has previously set forth the required elements to terminate parental rights pursuant to Subsection 2511(a)(8):

> In order to satisfy S[ubs]ection 2511(a)(8), [CYS] must show[:] (1) that the child has been removed from the care of the parent for at least twelve [] months; (2) that the conditions [that] led to the removal or placement of the child still exist; and (3) that

---

[15] Community Guidance Center provides counseling, therapy, and psychiatry services. We observe that Caseworker Mescall testified that Father was unsuccessfully discharged from that counseling in July 2024. *See* N.T. Involuntary Termination Hearing, 5/9/25, at 16.

termination of parental rights would best serve the needs and welfare of the child. Notably, termination under S[ubs]ection 2511(a)(8), does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement of his or her children.

*In re Adoption of M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017) (citation omitted).

Regarding the second prong of Subsection 2511(a)(8), above, the analysis is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). A parent's "progress toward remedying the conditions" is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of Subsection 2511(a)(8). *In re Adoption of R.J.S.*, 901 A.2d 502, 512 (Pa. Super. 2006). Subsection 2511(a)(8) "does not require an evaluation of the remedial efforts of either the parent or CYS." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012). Further, "determining whether the conditions that led to the removal remain is less of a hyper[-]technical task than it is a commonsense consideration of whether the conditions continue to stand in the way of reunification." *In re Adopt. of G.W.*, 342 A.3d 68, 2025 PA Super 152, 2025 WL 2025756, *9 (Pa. Super., filed July, 21, 2025) (*en banc*). As it relates to this second element under Subsection 2511(a)(8), this Court has recognized that strict application

may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly

- 13 -

recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re C.B.*, 230 A.3d 341, 349 (Pa. Super. 2020) (citation omitted).

Relevant to the third prong of Subsection 2511(a)(8), this Court has explained that:

> while both S[ubs]ection 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to S[ubs]ection 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as pr[e]scribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). "Although [S]ection 2511(a) generally focuses on the behavior of the parent, the third prong of [Subs]ection 2511(a)(8) specifically 'accounts for the needs of the child.'" *G.W.*, 342 A.3d 68, 2025 PA Super 152, at *33-34 (quoting *C.L.G.*, 956 A.2d at 1008-09). As it relates to the differences between the analyses under Subsection 2511(a)(8) and Section 2511(b), this Court has explained that,

> **only** if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both S[ubs]ection 2511(a)(8) and Section 2511(b) direct us to evaluate the needs and welfare of the child, we are required to resolve the analysis relative to S[ubs]ection 2511(a)(8), **prior to**[ ]**addressing** the needs and welfare of the child, as pr[e]scribed by Section 2511(b); as such,

they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*C.B.*, 230 A.3d at 349 (citation and quotation marks omitted; emphasis in original).

The orphans' court analyzed the circumstances of Father's case, concluding termination was appropriate, as follows:

> One need not be overtly abusive or neglectful to be deemed an unfit parent, and there is no indication that Mother and Father were either. Father, however, has persistently refused to do what was necessary to regain custody of [Child], while Mother lacks the mental capacity to adequately care for [Child] on her own and has chosen to align herself with Father even to the point of recommending that CYS consider [Father's] mother and abusive stepfather as a viable kinship option.
>
> To this day, Father denies doing anything that contributed to [Child]'s removal and continuing dependency. He insists that the signs other people saw of domestic abuse, anger, and aggression were misperceptions of his anxious responses to stressful situations. Thus, the most he will concede even now is that he has gained an understanding of why people misinterpret his anxiety-driven behaviors and has learned to implement coping mechanisms that help him respond to stressful stimuli in a more socially appropriate manner.
>
> Father's lack of self-awareness is quite possibly why he refused for well over a year to comply with [CYS]'s directive that he address his mental health. But refuse he did, and the fruit of that persistent refusal included continual outbursts, escalating aggression, and paranoid ideas about other people's motives in relation to [Child]'s dependency. It also included a continuing determination by [CYS] that he had failed to satisfy the known requirements for reunification. Yet[,] Father, who had been warned about the consequences of noncompliance, waited until [Child was] in CYS's custody for nearly nineteen months to engage with Penn Highlands and actively pursue mental health counseling, and after purportedly receiving six months of consistent therapy, the only thing he had clearly learned was how to blame an intangible—generalized anxiety—for how other people misperceived his conduct rather than taking personal

- 15 -

responsibility for how it actually was. Even assuming Father had been treating regularly with a therapist, therefore, his testimony indicated that he could not or would not remedy the primary cause of his incapacity within a reasonable period of time, because six months into it, he had apparently not developed any of the self-awareness that would help him to recognize and address his mental health issues.

Orphans' Court Opinion, 5/22/25, at 7-8 (footnote omitted).

After our review, we have located record support for affirming the orphans' court's findings of fact and conclusions of law, though on different grounds, which we may do if supported by the record. *See In re Adoption of Z.S.H.G.*, 34 A.3d 1283, 1288 (Pa. Super. 2011) ("we may affirm the orphans' court on any basis supported by the certified record"). Here, first, Father concedes CYS established the first prong of the Section 2511(a)(8) analysis. *See M.A.B.*, 166 A.3d at 446. As it relates to the second prong, among the conditions that led to Child's removal from Father's care were his aggression and lack of material resources. Importantly, the orphans' court did not find Father's termination hearing testimony credible. *See* Orphans' Court Opinion, 5/22/25, at 8 n.7 ("The document Father proffered to prove his attendance [in therapy] was inadmissible, and though the [c]ourt is reluctant to conclude that he was lying about bi-weekly therapy appointments, it is also unwilling to find his testimony credible given his history of noncompliance and insistence that he had done everything [CYS] asked him to do."). Conversely, the orphans' court credited and relied on Caseworker Mescall's testimony and concluded that Father failed to establish consistent employment, access to transportation, and engagement in therapy services.

***See*** N.T. Involuntary Termination Hearing, 5/9/25, at 25 (Caseworker Mescall testifying Father has not maintained stable employment and, during Child's dependency, father worked for at least five separate employers); ***see id.*** at 25-26 (Caseworker Mescall testifying family has no transportation due to selling vehicle after CYS paid for new tires); ***id.*** at 27 (Father's aggression behavior got progressively worse over course of Child's dependency); ***id.*** at 39 (Caseworker Mescall testifying CYS had no evidence that Father was attending therapy). We are bound by that orphans' court credibility determination that is supported by the record. ***See T.S.M.***, 71 A.3d at 267; ***see also*** Orphans' Court Opinion, 5/22/25, at 8 n.7. Moreover, there was no record evidence that reunification between Father and Child was imminent. ***See I.J.***, 972 A.2d at 11. Therefore, we conclude that CYS has established the second prong under Subsection 2511(a)(8) by clear and convincing evidence.

In turning to the third prong under Subsection 2511(a)(8), we observe that Child's needs cannot be met by Father because the record establishes that Father still lacks employment and transportation, thereby severely limiting his ability to provide material resources for Child's upbringing. ***See*** N.T. Involuntary Termination Hearing, 5/9/25, at 25-26. Conversely, Caseworker Mescall testified that Child's needs and welfare are adequately cared-for by the pre-adoptive foster family in West Virginia. ***See id.*** at 31. Consequently, CYS has established the third prong by clear and convincing evidence; thus, Father is not entitled to relief under Section 2511(a).

Therefore, we turn our attention to the court's analysis under Section 2511(b),

which relates to Father's fourth issue on appeal. ***See M.E.***, 283 A.3d at 830.

In his fourth issue, Father argues that terminating his parental rights to

Child is not in Child's best interest. ***See*** Appellant's Brief, at 26-29. Father

maintains that the pre-adoptive foster parents "only met [C]hild a handful of

times[, which is insufficient to establish they are] better suited to provide

permanency for [C]hild than [Child's] loving [biological] parents with whom

[Child] was already bonded." ***Id.*** at 27. Father contends that severing the

bond between Father and Child would be detrimental to Child's well-being as

he states he is able to provide for Child's developmental, physical, and

emotional needs and has consistently done so. ***See id.***

This Court has explained how courts in this Commonwealth should

conduct the Section 2511(b) analysis:

> Section 2511(b) requires the [o]rphans' [c]ourt to consider
> intangibles such as love, comfort, security, and stability when
> inquiring about the needs and welfare of the child. The court must
> also discern the nature and status of the parent-child bond, paying
> close attention to the effect on the child of permanently severing
> the bond. The extent of the bond-effect analysis necessarily
> depends upon the unique facts and circumstances of the particular
> case.
>
> > While a parent's emotional bond with his or her child is a
> > major aspect of the [S]ection 2511(b) best-interest
> > analysis, it is nonetheless only one of many factors to be
> > considered by the court when determining what is in the
> > best interest of the child. The mere existence of an
> > emotional bond does not preclude the termination of
> > parental rights. Rather, the orphans' court must examine
> > the status of the bond to determine whether its termination
> > would destroy an existing, necessary and beneficial

- 18 -

relationship. In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court has stated that the [orphans'] court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*M.A.B.*, 166 A.3d at 448 (citations, quotation marks, brackets, ellipsis, and emphasis omitted).

Moreover, we have explained how courts should consider existing bonds between children and their biological parents as follows:

[The conclusion that] a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R. S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted). "When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal

bonding evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

Instantly, the orphans' court considered Section 2511(b) and the factual circumstances of this case as follows:

> [. . . T]he court is confident that terminating Mother and Father's rights will best guarantee [Child]'s developmental, physical, and emotional needs and welfare. Now[,] two years, four months of age, [Child] has spent most of [Child's] life knowing other people as [] primary caregivers. Most recently, that has been the [pre-adoptive foster parents] in West Virginia—a family that is meeting all [Child's] needs, both tangible and intangible; a family with whom [Child] has bonded; and a family that plans to adopt [Child] and provide permanency if Mother and Father's rights are terminated.
>
> Although [Child]'s pre-adoptive [foster] parents are distantly related to Mother, termination may indeed permanently sever the bonds [Child] has developed with [Mother and Father]. The mere existence of a bond does not preclude termination, though; only when the bond is necessary and beneficial should it weigh heavily against that result, [. . .] and here[,] the evidence does not suggest parent-child bonds of that nature.
>
> The court does not doubt that [Child] was happy to see Mother and Father when [Child] visited. Nor does it doubt that [Child] requested and enjoyed specific activities [Child] associated with them, e.g., reading books together and having Father toss [Child] into the air. It may be, too, that [Child] was not eager to leave when [] having fun. Yet none of that indicated strong positive bonds that, if severed, could cause [Child] to experience severe emotional trauma. [Child], the evidence demonstrated, was a naturally happy and affectionate child who easily bonded with people. Accordingly, it was neither surprising nor particularly informative that [Child] formed bonds with Mother and Father, whom [Child] saw regularly and whose direct interactions with [Child] were always positive. What was informative, however, was that [Child's] apparent preference to stay longer with Mother and Father while they were having fun did not persist once [Child] was back in [Child's] foster parents' care after visits. What was informative, moreover, was that being separated from Mother and

Father did not adversely affect [Child], whereas [Child] beg[a]n exhibiting symptoms of distress stemming from [Child's] visits [with Mother and Father]—symptoms that did not recur after visits were terminated. Consequently, the court is confident that terminating Mother and Father's parental rights will not detrimentally sever a necessary and beneficial bond [Child] shares with them.

Orphans' Court Opinion, 5/22/25, at 9-10 (unnecessary capitalization omitted).

After our review, we again find the trial court's determinations are supported in the record, and we discern no abuse of discretion or error of law. Caseworker Mescall's testimony provides the necessary support for the court's finding that termination of Father's parental rights serves Child's best interests by clear and convincing evidence. *See Z.P.*, 994 A.2d at 1121; *see also* N.T. Involuntary Termination Hearing, 5/9/25, at 29 (Caseworker Mescall testifying that interaction between Child and pre-adoptive foster parents are "very positive. Child is very bonded with them; [Child] is comfortable in their home. [Child] was comfortable when I saw them up in Pennsylvania. [. . . Child is] doing phenomenal [in their home with them.]"); *id.* at 31 (Caseworker Mescall testifying that it would be in Child's best interest to terminate Father's and Mother's parental rights to allow permanency and stability where pre-adoptive foster parents "are maintaining the relationship with [the Rakes] while [Child] is [in West Virginia;] we walked in[,] and [Child] was on Face[T]ime with them. [Child] feels comfortable going and asking for what [Child] needs[ and] has all of the things that [Child] could possibly need, plus more. [Child is] very happy."). Indeed, Father did not establish his bond with Child is

necessary and beneficial to Child.  ***See M.A.B.***, 166 A.3d at 448.  Accordingly,

we conclude that Father is not entitled to relief on this final issue.  Thus, we

affirm the order terminating Father's parental rights to Child.

     Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  12/09/2025